<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                       :
ABDUL A. ABDULLAH,                     :
                                       :   Civil Action No. 10-1069 (NLH)
                Petitioner,            :
                                       :
        v.                             :       **O P I N I O N**
                                       :
MICHELLE RICCI, et al.,                :
                                       :
                Respondents.           :
_____:


**APPEARANCES:**

Abdul A. Abdullah, <u>Pro</u> <u>Se</u>
#434956/276104B
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Jack Richard Martin, Esq.
Office of the Atlantic County Prosecutor
P.O. Box 2002
Mays Landing, NJ 08330
Attorney for Respondents

**HILLMAN, District Judge**

    Petitioner, Abdul A. Abdullah, a prisoner at the

New Jersey State Prison, Trenton, New Jersey, submitted this

petition for a writ of habeas corpus pursuant to 28 U.S.C. §

2254.  The respondents are Administrator Michelle Ricci, and the

Attorney General of New Jersey.

    For the reasons stated herein, the petition must be denied.

## BACKGROUND

### A.   Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division ("Appellate Division"), in Petitioner's direct appeal.[1]  See Respondents' Exhibit ("RE") 9.

> Defendant, also known as Aleem, first met Catrina Lark in 1996 and thereafter they developed a relationship. Defendant would visit Lark during the day and return to his girlfriend Joan Robinson's apartment at night. Defendant fathered two children with Robinson and referred to her as his "wife." Defendant's relationship with Lark ended sometime between December 1998 and January 1999. Lark then began dating defendant's cousin Robert Boswell. After being incarcerated on January 15, 1999, in the Atlantic County Jail for a parole violation, defendant learned that Lark was seeing his cousin. Soon thereafter, Boswell was incarcerated in the same jail. On March 21, 1999, Corrections Officer Frank Timik observed an argument between defendant and Boswell while they were being visited by their respective girlfriends. Timik heard defendant call Lark a "bitch" and a "whore." Defendant and Boswell were thereafter placed on the no contact list.

> According to Lark's mother, Shelby, Lark refused to accept daily collect calls from defendant after their relationship ended. Phone records from Atlantic County Jail indicate that defendant made 467 calls to Lark from the County Jail. (Defendant admitted making numerous calls to Lark, including 192 calls in a single day.) Shelby testified that one day in March, while she

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

2

was visiting Lark, she accepted a call from defendant and used the occasion to tell him to stop calling her daughter because Lark did not want to be bothered by him anymore. Shelby stated that defendant responded: "If I can't have the bitch, nobody can have her. I'll kill her first."

Defendant claimed that he made the calls after he learned Lark was pregnant with his child and she threatened to abort the pregnancy if he did not leave his wife. Defendant told Lark that he would not leave his wife but that he would be a father to his child. He denied ever threatening Lark. Defendant was released from the county jail in April 1999.

On May 1, 1999, at approximately 3:30 a.m., Lark phoned Jessica Ruiz, her friend and neighbor who lived in an apartment across the street from her. At the time Ruiz was awake watching television with her then boyfriend, Lark's cousin, Ronald Taylor. Ruiz related that Lark called her and told her that defendant was outside "knocking on her window trying to get in her house." Before hanging up the telephone, however, Lark told Ruiz that defendant had left the area and that she would be all right.

Stella Hargrove lived on the second floor in the same apartment building as Lark. She testified that she was awakened in the early morning hours by a female voice in Lark's apartment saying, "Aleem don't hit me." Ronald Taylor woke up and left Ruiz's apartment between 7:00 and 8:00 a.m. He went across the street to visit Lark. When Taylor arrived at Lark's apartment, he found the door unlocked and Lark lying on the kitchen floor. The apartment was in complete disarray and Lark was lying in a pool of blood. Taylor ran back to Ruiz's house and told her to call the police.

Officer Ed Leon of the Atlantic County Police Department was dispatched to Lark's apartment. Leon found Lark lying on her kitchen floor, nude from the waist down, with a pool of blood around her head. She had no pulse, her skin was cold, and she was becoming rigid.

Police officers seized various items from Lark's apartment believed to be associated with the attack that were either near the body or in Lark's bedroom.

3

The items included: a blood stained rolling pin, a
broken clothes iron, a broken ceramic lamp, a broken
cast iron frying pan, three blood-stained serrated
steak knives with bent blades, three blood-stained
kitchen knives with broken blades, and three intact
bloodstained kitchen knives. Only two items, both
serrated steak knives, were not found in plain view-one
behind a chair in the bedroom and the other on the
right side of a sofa cushion which was slightly askew.
According to the Atlantic County Medical Examiner,
Doctor Hydow Park, Lark's death was caused by "multiple
blunt and sharp force injuries to the head, neck, and
upper torso areas." These included numerous stabbing
and cut wounds to her head, face, neck, back, hands,
and chest. Additionally, Lark had a large open skull
fracture around her left eye caused by a heavy object.

Phillip Beesley, a Senior Forensic Scientist with
the Department of Law and Public Safety Forensic
Science Section (the Department), testified that
swabbings taken from various locations in the apartment
tested positive for blood and tissue and were submitted
for DNA testing, along with blood samples taken from
the victim and defendant. Patricia Prusak, also a
Senior Forensic Scientist employed by the Department,
found defendant's DNA matched one of the specimens
taken from the apartment and also matched the source
mixed with Lark's DNA on two other specimens taken from
the apartment.

Officer Howard Mason and several other officers
went to defendant's home. Mason noticed that defendant
had a cut on his hand that was bleeding. Defendant
claimed that he was injured when he fell from his
bicycle. He also stated that he had not left his house
the entire night. Defendant claimed that he had not
been in Lark's apartment since the last week in
December 1998.

Robinson told police that defendant left her
apartment at approximately 2:40 a.m. and made a great
deal of noise when he returned between 3:00 and 3:30
a.m. Two of defendant's fingerprints were found on the
handle of the frying pan found next to Lark's body. A
bloodstained glove belonging to defendant and used by
him to lift weights was recovered from Lark's
apartment.

> At trial, Defendant admitted that he left his house at about 2:30 a.m. to purchase some marijuana. Victor Winters, a witness called by defendant, acknowledged selling marijuana to defendant and smoking it with him for about half an hour. Defendant denied referring to Lark as a "bitch" and a "whore" during the alleged incident at the county jail. Defendant also denied threatening Lark in a conversation with Lark's mother. He also claimed that approximately a week after he was released from jail and a week to ten days before the murder he saw Lark at a party at his cousin's house. According to defendant, there was no confrontation or ruckus between them. They had a brief conversation concerning whether she aborted her child. He claimed that they really did not interact and "would just pass each other by without too much conversation at all."

See Respondents' Exhibit 9, State v. Abdullah, 372 N.J. Super. 252, 260-63 (App. Div. 2004).

## B.   **Procedural Background**

An Atlantic County Grand Jury returned an indictment charging Petitioner with seven counts including murder, burglary, and various charges of possession of a weapon for an unlawful purpose, all in violation of New Jersey state law.

Prior to trial, motions to suppress and to dismiss the indictment were held.  Trial was held in the Superior Court of New Jersey, Atlantic County, from June 24, 2002 to July 3, 2002. A jury found Petitioner guilty of all seven counts of the indictment.

On September 13, 2002, Petitioner was sentenced to life imprisonment, with a 30-year period of parole ineligibility for the murder charge, and to a consecutive 10-year sentence on the

burglary charge.  All other charges were merged for sentencing purposes.

Petitioner appealed.  On October 12, 2004, the Appellate Division affirmed the conviction and sentence.  Petitioner filed a petition for certification with the New Jersey Supreme Court. On August 2, 2005, the Supreme Court affirmed the conviction but remanded for resentencing in accordance with State v. Natale (Natale II), 184 N.J. 458 (2005).  On remand, the same sentence was imposed.  Petitioner did not appeal the resentence.

On October 18, 2005, Petitioner filed a pro se motion for post-conviction relief (PCR) in the sentencing court.  The motion was denied on October 31, 2006.  The Appellate Division affirmed the denial on October 1, 2008.  Petitioner's petition for certification to the New Jersey Supreme Court was denied on April 23, 2009.

Petitioner filed this habeas petition on March 3, 2010. Petitioner was advised of his rights pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), and Respondents were ordered to answer.  Respondents filed an answer to the petition and the available state court record on or about September 9, 2010.  On March 30, 2011, Petitioner filed a Traverse/Reply to the Answer addressing the timeliness of his petition.

C.   <u>**Petitioner's Claims**</u>

Petitioner cites seven grounds for relief (Petition, ¶ 12 and Addendum).

1.   The trial court should have charged the jury on the lesser-included offense of passion/provocation manslaughter.

2.   Prosecutorial misconduct deprived Petitioner of a fair trial.

3.   Ineffective assistance of trial counsel by failing to object to the introduction of certain evidence without a proper curative instruction deprived Petitioner of his Sixth Amendment rights.

4.   Petitioner was deprived of his due process rights to DNA testing prior to the trial.

5.   The State violated <u>Brady</u> by failing to disclose the jail telephone toll records that were in the State's possession prior to Defendant's trial.

6.   Ineffective assistance of trial counsel at the suppression hearing and by failing to interview alibi witnesses before calling them to the stand.

7.   Petitioner's sentence is contrary to clearly established federal law.

## 28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an

unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). <u>Id.</u> at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. <u>Id.</u> at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. <u>See Matteo v. Superintendent</u>, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. <u>See Chadwick v. Janecka</u>, 302 F.3d 107, 116 (3d Cir. 2002) (citing <u>Weeks v. Angelone</u>, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. <u>See Hameen v. State of Delaware</u>, 212 F.3d 226, 248 (3d Cir. 2000), <u>cert. denied</u>, 532 U.S. 924 (2001); <u>Purnell v. Hendricks</u>, 2000 WL

9

1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal case law, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d

Cir. 1989); <u>United States v. Brierlev</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert.</u> <u>denied</u>, 399 U.S. 912 (1970).

<u>**DISCUSSION**</u>

A.   <u>**Jury Charge Claim (Ground 1)**</u>

Petitioner argues that the trial court's failure to charge on the lesser-included offense of passion/provocation deprived him of his constitutional rights.  Relying on his direct appeal brief, Petitioner argues that the evidence in the case suggesting that Petitioner killed Lark in the heat of passion was not "implausible."  In fact, the State raised the issue of Petitioner's "rage" and "anger" during opening remarks and in summation.  Petitioner points to evidence of his attempts at reconciliation, his awareness of Lark's pregnancy and abortion, Lark's rejection of Petitioner, his obsession with Lark, and the rage with which he allegedly murdered her.  Defense counsel had requested a charge for passion/provocation manslaughter, which was denied.  Petitioner argues that under New Jersey state law, the charge should have been given to the jury.  (RE 3, at pp. 8-16).

The Appellate Division examined this claim on direct appeal, finding:

> On appeal, defendant asserts that there was a rational basis to support a jury charge on passion/provocation manslaughter. He points to the State's opening and closing arguments in which the prosecutor told the jury that defendant "in his rage"

11

murdered Lark and that defendant was "angry" and "furious."

N.J.S.A. 2C:1-8e directs that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." When a defendant requests a charge on a lesser offense, the trial judge must focus on the facts in evidence "to ensure that there is a rational basis for a jury to reject the greater charge and convict of the lesser" charge. Moreover, where the evidence reasonably supports defendant's request for a jury charge on a lesser-included offense, a trial court's failure to give it is reversible error.

The elements of passion/provocation manslaughter are: (1) adequate provocation; (2) absence of a cool-off period between the provocation and the slaying; (3) the provocation must have actually impassioned the defendant; and (4) defendant must not have cooled off before the slaying. N.J.S.A. 2C:11-4b(2). The evidence did not support such a charge. See also State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990).

The judge correctly determined that the evidence was insufficient to establish adequate provocation at or about the time of the murder or that defendant did not have a reasonable time to cool off. Lark broke off the relationship approximately five months before she was killed. Defendant was angered while he was in jail when he learned in January that Lark was seeing Boswell and that she was pregnant. He was also concerned and tried to dissuade her from terminating her pregnancy. Clearly, there was a sufficient cool-down period between the incidents that occurred while defendant was incarcerated and when Lark was killed.

The subject of her pregnancy came up again at the party held approximately one week before the murder. Although the record is somewhat unclear, defendant may have learned that Lark had terminated her pregnancy. However, there is no evidence that defendant was angered by this turn of events. According to his testimony, there was no confrontation or ruckus between them when they met at the party. More importantly,

> there is no evidence that the two had any interaction
> following the party. Even if one could conclude that
> defendant was angered by Lark's relationship with
> Boswell or the termination of her pregnancy at the time
> he saw her at the party, there was more than ample time
> for defendant to cool off.

RE 9, State v. Abdullah, 372 N.J. Super. 252, 265-66 (App. Div. 2004)(internal citations omitted).

"Due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." Hopper v. Evans, 456 U.S. 605, 611 (1982). See also Keeble v. United States, 412 U.S. 205, 208 (1973) (A lesser included offense instruction should be given "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater."). As noted, in New Jersey,

> [p]assion/provocation manslaughter has four elements:
> the provocation must be adequate; the defendant must
> not have had time to cool off between the provocation
> and the slaying; the provocation must have actually
> impassioned the defendant; and the defendant must not
> have actually cooled off before the slaying.... If a
> slaying does not include all of those elements, the
> offense of passion/provocation manslaughter cannot be
> demonstrated.

State v. Mauricio, 117 N.J. 402, 411 (1990). In the instant case, the trial judge denied defendant's request for a passion/provocation charge, and the Appellate Division affirmed. This factual finding is not contradicted in the record by clear

13

and convincing evidence and, therefore, is entitled to deference from this Court. See 28 U.S.C. § 2254(e)(1). Moreover, even if the presumption did not exist, Petitioner's claim would fail. This Court finds that the evidence at trial simply did not warrant a passion/provocation charge. As noted by the Appellate Division, the record lacks the evidence necessary to establish all of the elements of that offense and, as such, due process did not require the jury to be so charged. As such, Petitioner has not demonstrated that the decision of the Appellate Division was either contrary to or an unreasonable application of clearly established federal law, or that it was based on unreasonable determination of the facts in light of the evidence before the state court. Consequently, the Petition is denied as to this ground.

**B.** **Prosecutorial Misconduct Claims (Ground 2)**

In Ground 2, Petitioner argues that the prosecutor ridiculed the defense, rendered his personal opinion of Petitioner's guilt, and expressly told the jury that Petitioner and his alibi witnesses were liars. As noted in the Appellate Division opinion:

> Specifically, defendant asserts that the following remarks were improper:
>
> (1) [W]e know he lied and we know he lies when it's convenient. He chooses when he's going to be truthful ... when he's going to be honest, whether it's going to hurt him, whether it's going to help him.

(2) So clearly when he says he had no anger towards
her, he just wanted to find out about this baby
situation ... and everything was cool between them,
clearly that's not the truth.

(3) I submit the testimony of Victor Winters is not
credible. It was not believable. The first time Mr.
Kramer talks to Victor Winters was Monday, last Monday.
Victor Winters adds information as he goes along ... I
could just see how he's lying.

(4) When you look at it in conjunction with all the
other evidence we know he [defendant] was not truthful
about how he got those cuts on his hands. Clearly it
was a time when he felt he needed to lie. He lied here
and he lied to the police.

(5) The defendant can't tell the truth about this
because the truth puts him in the middle of a
murder....

RE 9; Abdullah, 372 N.J. Super. at 265.  Furthermore, in his

argument that the State improperly denigrated the defense,

Petitioner points to the prosecutor's closing remarks, as set

forth in the Appellate Division opinion:

Now during the testimony of the defendant it
reminded me of a documentary that I saw recently....
And it was a documentary on the octopus. Now the
octopus is an animal that has a very unusual defense
mechanism and that's called an ink pack and when an
octopus becomes afraid, when he becomes fearful because
an enemy may be coming near, he releases that ink pack.
The purpose of releasing that ink pack ... is to muddy
the waters so you can't see clearly, so you can't see
through the mud and he tries to use that muddy water to
escape. And that's what we saw from the defendant when
he was on the witness stand. He's got an answer for
every piece of evidence in this case. He's a victim of
circumstances from witnesses who mishear things to ...
police who are planting evidence.

Officer Francisco must be part of this police ...
conspiracy to set this defendant up, along with all the
other people that we heard that must have been part of

15

this extravagant convoluted conspiracy to set this defendant up.

If they [the police] don't remember something, they're lying. They're trying to hide things. There's a conspiracy behind every door.

Every piece of evidence that ties this defendant to the crime was because of trickery, lying, deceit, everybody wants to be on the team.

She knew she was going to die that evening and she decided [to say] that the defendant was outside her window just to set him up when she's in the after life. I mean how ridiculous does that have to be to believe-the defense theory?

Now if the State is so corrupt and these investigators are so corrupt, why aren't they pouring her blood onto his clothes ... ?

And all the police officers that ... were there must have been in on this conspiracy. That's what the defense wants you to believe.

RE 9; Abdullah, 372 N.J. Super. at 269.

The United States Supreme Court has recognized the

obligation of a prosecutor to conduct a criminal prosecution with

propriety and fairness:

He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.... Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935). In Berger, the

Supreme Court determined that a prosecutor's actions amounted to

16

prosecutorial misconduct when he put "words into the mouths" of witnesses, assumed prejudicial facts that were not evidential and pretended to hear things that witnesses had not actually heard. Berger, 295 U.S. at 84.  It is duly noted that "[t]he line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone. Prosecutors sometime breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence." United States v. Young, 470 U.S. 1, 7 (1985).

Under United States Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Here, the Appellate Division examined the prosecutorial misconduct claims and found:

> The prosecutor did not offer a personal opinion of defendant's veracity, or refer, explicitly or

17

> implicitly, to matters outside of the record but
> instead commented, in light of the conflicting
> evidence, that defendant and Winters were not truthful.
> Moreover, the trial judge instructed the jury that the
> comments of counsel were not evidence and were not
> controlling. Credibility was hotly contested by the
> defense and the prosecutor's statements were made in
> response to the defense's position.

RE 9; Abdullah, 372 N.J. Super. at 269 (internal citation

omitted).  Further, the Appellate Division held "a prosecutor is

permitted to respond to arguments raised by the defense so long

as it does not constitute a foray beyond the evidence adduced at

trial. Here, the prosecutor was forcefully responding to

defendant's assertions. We do no[t] believe that his remarks in

response to the defense were unjustified or sufficiently

egregious to deprive defendant of a fair trial."  Id. at 269-70

(internal citations omitted).

This Court agrees that the prosecutor's comments in the

instant case did not "so infect the trial with unfairness" nor

did his actions equate to those of the prosecutor in Berger such

that Petitioner was denied his due process rights.  Here, the

evidence against Petitioner was abundant.  Petitioner's DNA was

found in specimens taken from Lark's apartment; fingerprints were

found in the apartment near the body; a bloodstained glove

belonging to Petitioner was found in the apartment; testimony

placed Petitioner at the apartment the evening of the murder;

testimony was introduced that Petitioner referred to Lark as a

"bitch" and a "whore" while in the county jail, and had conveyed

18

to Lark's mother that he was going to kill Lark.  Therefore, it cannot be said that the trial was infected with unfairness because of the prosecutor's comments.  A review of the record reveals that there was no denial of due process in obtaining Petitioner's conviction.

Moreover, the trial judge's jury instruction explained to jurors how to weigh the evidence presented by the prosecution. The judge charged:

> And exactly the same thing is true with regard to the comments of counsel during the course of trial or during their summations or otherwise.  While I'm well satisfied that no attorney in this case endeavored to misstate anything that was testified to, if for any reason your recollection differs from theirs, again, yours is the controlling recollection.

RE 24 at pp. 6-7.

Thus, it is clear to this Court that Petitioner's claims regarding prosecutorial misconduct do not have merit, and do not warrant habeas relief.  Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the trial court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

19

## C.   **Ineffective Assistance of Counsel Claims (Grounds 3 and 6)**

Petitioner argues in Ground 3 that trial counsel was ineffective for failing to object to the State's introduction of multiple instances of other crimes evidence without a proper curative instruction.  In the state courts, this claim was presented as an error by the trial court in allowing other crimes evidence without a proper curative instruction.  In Ground 6, Petitioner argues that counsel was ineffective at the suppression hearing, by failing to conduct pre-trial investigation, and by failing to interview the alibi witnesses before calling them to the stand.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right ... to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at

687-88.  To meet this prong, a "convicted defendant making a
claim of ineffective assistance must identify the acts or
omissions of counsel that are alleged not to have been the result
of reasonable professional judgment."  Id. at 690.  The court
must then determine whether, in light of all the circumstances at
the time, the identified errors were so serious that they were
outside the wide range of professionally competent assistance.
See id.

To satisfy the prejudice prong, the defendant must show that
"there is a reasonable probability that, absent the errors, the
factfinder would have had a reasonable doubt respecting guilt."
Id. at 695.  As the Supreme Court explained,

> In making this determination, a court hearing an
> ineffectiveness claim must consider the totality of the
> evidence before the judge or jury.  Some of the factual
> findings will have been unaffected by the errors, and
> factual findings that were affected will have been
> affected in different ways.  Some errors will have had
> a pervasive effect on the inferences to be drawn from
> the evidence, altering the entire evidentiary picture,
> and some will have had an isolated, trivial effect.
> Moreover, a verdict or conclusion only weakly supported
> by the record is more likely to have been affected by
> errors than one with overwhelming record support.
> Taking the unaffected findings as a given, and taking
> due account of the effect of the errors on the
> remaining findings, a court making the prejudice
> inquiry must ask if the defendant has met the burden of
> showing that the decision reached would reasonably
> likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.

The Supreme Court instructs that a court need not address
both components of an ineffective assistance claim "if the

21

defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

In this case, the Appellate Division examined Petitioner's ineffective assistance of counsel claims on appeal of his PCR motion.  The Appellate Division, citing Strickland, held:

> We reject these arguments and affirm. Our standard of review here is well-settled.
>
> In State v. Fritz, this Court adopted the standard articulated by the United States Supreme Court for evaluating ineffective assistance of counsel claims. In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Court created a two-prong test for evaluating claims of ineffective assistance of counsel. Under the test, a reviewing court must determine: (1) whether counsel's performance "fell below an objective standard of reasonableness," and if so, (2) whether there exists a "reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different[.]"
>
> Here, defendant has not presented any evidence that defense counsel's trial performance fell below the professional standard expected by an attorney practicing in this state. Indeed, implementation of some of the approaches urged by defendant in this PCR petition would have constituted ineffective assistance of counsel. By way of example, defendant raised at trial an alibi defense, arguing that he had not been in the victim's home at the time she was killed. In this light, any arguments raised now concerning defendant's state of mind would have directly undermined this trial strategy.

State v. Abdullah, 2008 WL 4648358 at *3 (N.J. Super. App. Div. 2008).

As to Petitioner's claim regarding the other crimes evidence, although Petitioner casts his claim in this habeas petition as one of ineffective assistance of counsel, Petitioner's claim was rejected in the state courts as improperly admitted evidence.  The state courts found that Petitioner's approximately 1000 harassing calls to the victim were not evidence of other crimes and were properly admitted, especially since the trial judge gave a limiting instruction.  As the trial judge gave a limiting instruction, and because the evidence was found to be properly admitted by the state courts, Petitioner's argument here that counsel was ineffective for failing to object to the evidence is meritless.

Further, this Court has reviewed the record of Petitioner's proceedings and agrees with the state courts that trial counsel's performance was not deficient; in addition, this Court maintains that Petitioner has not demonstrated that there is a reasonable probability that, absent any of the alleged errors, the factfinder would have had a reasonable doubt respecting guilt. As noted in this case, the evidence against Petitioner was overwhelming.

As the record reveals that the state courts relied on the Strickland standard in evaluating Petitioner's ineffective counsel claims, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the trial court "resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Petitioner's claims will be denied.

D.   **DNA Testing Claim (Ground 4)**

Petitioner argues in Ground 4 that he was deprived of his due process rights to DNA testing prior to trial.  Petitioner raised this argument on direct appeal in the form of an ineffective assistance of trial claim, which was considered by the Appellate Division as "evidence beyond the trial record . . . best addressed on an application for post-conviction relief."  RE 9; Abdullah, 372 N.J. Super. at 276-77.  In his PCR petition, Petitioner alleged that counsel should have had independent DNA lab work done.  The State pointed out that the State's DNA expert identified Petitioner's blood and his blood mixed with the victim's blood, inside the crime scene, with an extremely high degree of certainty.  The defense position was that since Abdullah had lived at the crime scene it would not be unusual to find his blood at the scene in order to minimize the evidence's damaging effect.  The State surmised that trial counsel's decision not to challenge the DNA testing procedure was a tactical decision based on the inability to effectively counter

the DNA evidence.   RE 16 at pp. 19-20.   The Appellate Division rejected Petitioner's argument in the PCR opinion.   See Abdullah, 2008 WL 4648358 at *2.

Generally, issues as to the admissibility of evidence are questions of state law and not subject to federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 68 (1991); Johnson v. Rosemeyer, 117 F.3d 104, 112-15 (3d Cir. 1997); Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir.), cert. denied, 534 U.S. 973 (2001). Federal courts must afford the states deference in determinations regarding evidence and procedure. See Crane v. Kentucky, 476 U.S. 683, 690 (1986).  It is well-established that "a state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citations omitted), cert. denied, 522 U.S. 1109 (1998).

Evidentiary rulings may violate due process when the petitioner is denied fundamental fairness at trial.  See Kontakis v. Beyer, 19 F.3d 110, 120 (3d Cir. 1994), cert. denied, 513 U.S. 881 (1994); Lisenba v. California, 314 U.S. 219, 228, 236 (1941) (holding that state court's evidentiary rulings may form the basis for habeas relief when they "so infused the trial with unfairness as to deny due process of law").  However, "the Due

25

Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n. 6 (1983).  Thus, the admissibility of evidence is generally a question of state law which is not cognizable under habeas review. See Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court, however, cannot decide whether the evidence in question was properly allowed under the state law of evidence").

The appropriate inquiry is "whether the claimed error of law is a fundamental defect which inherently results in a complete miscarriage of justice or in an omission inconsistent with the rudimentary demands of fair procedure."  Hutchins v. Hundley, 1991 WL 167036 at *4 (D.N.J. Aug. 22, 1991) (citing United States v. De Luca, 889 F.2d 503, 506 (3d Cir. 1989), cert. denied, 496 U.S. 939 (1990)) (other citations omitted).  The Supreme Court has further stated that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say on the whole record that the constitutional error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).  An error is not harmless if "it aborts the basic trial process or denies it altogether." Hutchins, 1991 WL 167036 at *5 (citing Rose v. Clark, 478 U.S. 570, 578 n.6 (1986)).

In this case, the testimony and qualification of the expert as to the DNA evidence was permissible under state law and rules

26

of evidence, and did not amount to an error of constitutional dimension.  As noted by the trial court in the PCR transcript, "there is no showing that anything with respect to DNA testing that was done in any way [was] not done in a proper fashion."  RE 24 at p. 16.  Petitioner has not shown that the trial process was fundamentally unfair, or that the state trial court evidentiary rulings allowed the admission of any improper evidence.  As noted, the evidence against Petitioner was overwhelming, and Petitioner has not convinced this Court that the DNA testing requested could have changed the outcome of trial.

Further, Petitioner has not demonstrated, as required under 28 U.S.C. § 2254(d), that the actions of the state court in this regard resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on this claim.

### E.    *Brady* **Violation Claim (Ground 5)**

In Ground 5, Petitioner argues that the State failed to disclose the jail telephone toll records from January 15, 1999 to February 21, 1999 that were in the State's possession prior to trial.

The United States Supreme Court has held that the prosecution in a criminal proceeding has a due process obligation

27

to disclose to the defendant its knowledge of material evidence favorable to the defendant, either because the evidence is exculpatory or because it can serve to impeach a key prosecution witness. See Kyles v. Whitley, 514 U.S. 419, 433 (1995); Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963).  Supreme Court precedent clarifies that "[t]here are three components of a true Brady violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985); see also California v. Trombetta, 467 U.S. 479, 488-89 (1984) (state's failure to retain breath samples was not unconstitutional where the chances are extremely low that preserved samples would have been exculpatory).

In the instant case, as noted in the Appellate Division opinion on direct appeal:

> [D]efendant contends that the State turned over phone
> records evidencing some 467 telephone calls for the

28

> period between February 22 and April 3, 1999. He argues
> that the State suppressed evidence favorable to him,
> specifically, the telephone records for the period
> between January 1 and February 22, 1999. He claims that
> those phone records would have corroborated his testimony
> that he learned that Lark was pregnant and she threatened to
> terminate the pregnancy if he did not leave Robinson.
> Defendant's claim simply lacks merit. The record reveals
> that all phone records involving defendant's pin number were
> moved into evidence. Moreover, even if they were not,
> defendant would have been fully aware of the telephone calls
> made by him and he could have readily obtained the records
> or moved to have the State produce them.

RE 9; Abdullah, 372 N.J. Super. at 275-76.  A witness
authenticated that the report included all calls from the jail to
Petitioner's "pin" number.  Neither the accuracy, nor
completeness of the telephone records was disputed at trial.  RE
24, 7T, Transcript of June 26, 2002, p. 172-175 (Testimony of T-
Netix call representative that all calls from Petitioner's pin
number at the jail were included in her report).

As suggested by the Appellate Division in the state court
proceedings, Petitioner has not demonstrated a Brady violation,
as the evidence sought by Petitioner was not suppressed by the
State, or would have been available to Petitioner to obtain
himself, or to move to have the State produce them.

**F.   Sentencing Claim (Ground 7)**

In Ground 7, Petitioner argues that his right to a jury was
violated when he was sentenced to consecutive maximum terms,
including discretionary periods of parole ineligibility, based
upon facts neither admitted by him, nor found by a jury.

29

On direct appeal, this claim was remanded by the New Jersey Supreme Court to the Appellate Division for re-sentencing in accordance with Natale II, 184 N.J. 458 (2005).  See State v. Abdullah, 184 N.J. 497 (2005)(thoroughly reviewing Petitioner's sentence).  On re-sentencing, Petitioner received the same sentence, which Petitioner did not appeal.

A federal court's ability to review state sentences is limited to challenges based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies."  See Grecco v. O'Lone, 661 F. Supp. 408, 415 (D.N.J. 1987) (citation omitted).  Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation.  See Pringle v. Court of Common Pleas, 744 F.2d 297, 300 (3d Cir. 1984); see also 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67 (1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  For example, in Gryger v. Burke, 334 U.S. 728, 731 (1948), the Supreme Court rejected the petitioner's due process challenge to a life sentence imposed by the Pennsylvania courts.  Petitioner argued that the sentencing judge mistakenly regarded as mandatory a sentence which was discretionary.  The Supreme Court held:

> We are not at liberty to conjecture that the trial
> court acted under an interpretation of the state law
> different from that which we might adopt and then set
> up our own interpretation as a basis for declaring that

30

> due process has been denied. We cannot treat a mere
> error of state law, if one occurred, as a denial of due
> process; otherwise, every erroneous decision by a state
> court on state law would come here as a federal
> constitutional question.

Id. at 731.

Here, Petitioner was sentenced in accordance with state law.
His sentence was examined at length by the New Jersey Supreme
Court, which remanded for resentencing.  Petitioner has not
provided this Court with any justification to grant habeas relief
and upset the state court proceedings as to his state law
sentence.

## CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or
judge issues a certificate of appealability, an appeal may not be
taken from a final order in a proceeding under 28 U.S.C. § 2254.
A certificate of appealability may issue "only if the applicant
has made a substantial showing of the denial of a constitutional
right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this
standard by demonstrating that jurists of reason could disagree
with the district court's resolution of his constitutional claims
or that jurists could conclude the issues presented are adequate
to deserve encouragement to proceed further."  Miller-El v.
Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

## CONCLUSION

For the reasons set forth above, the petition will be denied.  An appropriate order follows.


                                  /s/ Noel L. Hillman
                                 NOEL L. HILLMAN
                                 United States District Judge

Dated: March 31, 2011

At Camden, New Jersey